**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

DENA WINSLOW,                                    )
                                                 )
                          Plaintiff,             )
                                                 )
v.                                               )   Docket no. 1:11-cv-162-GZS
                                                 )
COUNTY OF AROOSTOOK &                            )
NOTHERN MAINE DEVELOPMENT                        )
COMMISSION, INC.,                                )
                                                 )
                                                 )
                          Defendants.            )


**ORDER ON AROOSTOOK COUNTY'S MOTION FOR SUMMARY JUDGMENT**


        Before the Court is Defendant Aroostook County's Motion for Summary Judgment (ECF

No. 29).  As explained herein, the Court GRANTS the Motion.


**I.      LEGAL STANDARD**

        Generally, a party is entitled to summary judgment if, on the record before the Court, it

appears "that there is no genuine dispute as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at

248.  A "material fact" is one that has "the potential to affect the outcome of the suit under the

applicable law." Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

In the District of Maine, the parties are required to present the factual record for summary judgment in accordance with Local Rule 56. Having reviewed the statements of material fact and supporting exhibits in accordance with Local Rule 56, the Court proceeds to lay out the

undisputed facts as well as any disputed material facts viewed in the light most favorable to Plaintiff in the following section.

## II.    FACTUAL BACKGROUND

The Local Area I Workforce Investment Board ("LWIB") operates in Maine's Aroostook and Washington counties and, as a result, has two co-Chief Local Elected Officials (CLEOs). During the time relevant to this case, the CLEOs were Norm Fournier, a county commissioner for Aroostook County, and Chris Gardner, a county commissioner for Washington County. Barry McCrum is the chair of the LWIB and has served in that capacity for over ten years. McCrum and the other members of the LWIB are volunteers and receive no compensation for their LWIB work.  LWIB oversees work that is federally funded by the Work Investment Act ("WIA").  From 1999 until early 2010, Aroostook County was the grant sub-recipient for the LWIB.  In that capacity, Defendant Aroostook County acted as the fiscal agent for LWIB. Additionally, Aroostook County hired and supervised staff for LWIB to the extent such staffing was funded under WIA.  However, this latter delegation was never memorialized in a written agreement between LWIB and Aroostook County.

On March 25, 2008, Plaintiff Dena Winslow was hired as the Executive Director of LWIB.  She was offered the position by Doug Beaulieu, the Aroostook County Administrator. She began work as LWIB's Executive Director on April 3, 2008.  Pursuant to the job description in place during Winslow's tenure, the County Administrator was the direct supervisor of LWIB's Executive Director and completed performance evaluations for the LWIB Executive Director. While employed as LWIB's Executive Director, Winslow received benefits from Aroostook

County as well as paychecks and W-2s issued by Aroostook County.   However, Aroostook County used funds received from the WIA Program to fund Winslow's salary and benefits.

### Winslow's Medical Issues & Requests for Accommodations

Prior to working as LWIB's Executive Director, Winslow had had neck and shoulder pain that was getting progressively worse.  As a result of her neck pain, Winslow had significant difficulty with turning her head, which affected daily activities, such as driving.  Winslow's neck pain was constant but was further aggravated by lifting objects or doing anything that involved twisting or bending.   As a result of these neck problems, Winslow's doctor gave her a handicapped placard for her car several years prior to 2008.  As a result of her shoulder pain, Winslow had difficulty using her right arm for anything, including typing, lifting, fine motor skills, handwriting, and the like.  Because she is right-handed, that limitation caused significant difficulties for her both with work and her other regular daily activities. Winslow frequently dropped things, and had to modify the way that she did things to compensate for her right arm limitations.

During her employment as LWIB's Executive Director, Winslow had multiple surgeries to address her neck and shoulder conditions.  First, on June 23, 2008, Winslow had a spinal fusion in which bone from her hip and a titanium plate were used to stabilize her neck.  Winslow first discussed needing this surgery with Beaulieu, her supervisor, on or around June 9, 2008, at which time she presented a doctor's note.  During that meeting, Beaulieu told Winslow that if she was out more than three weeks in connection with this surgery, he would not hold her job. Later that same day, Winslow and Beaulieu met again in her office.  During that afternoon meeting, Winslow requested secretarial assistance as an accommodation.  After three weeks of post-surgical convalescence, Winslow was released to work on July 14, 2008 with restrictions of

no lifting greater than five pounds, no long distance driving greater than twenty miles and rest breaks as needed.  These restrictions were subsequently lifted on August 7, 2008.  Given the doctor-ordered restrictions in place from July 14th to August 7th, Winslow requested accommodations in the form of a secretary to assist with lifting and administrative work and a driver to take her to meetings.  Winslow was not provided a driver or secretary during this time period.[1]  With respect to her driving restrictions, Winslow was told that she did not have to go to meetings and/or that she could use teleconferencing or video conferencing during this time period when her driving ability was limited.

Winslow's second surgery took place on March 2, 2009 at which time doctors repaired a torn rotator cuff in her right shoulder.  Winslow returned to work on March 9, 2009 but was subject to driving restrictions and had limited use of her right arm.  As a result, she requested accommodations in the form of a driver and a secretary for an eight week period.  Her supervisor, Beaulieu, again indicated that she could skip meetings or attend via teleconference or video conference.  Winslow was not provided a secretary during this time period.

Winslow's third surgery took place on June 1, 2009 at which time doctors repaired her left rotator cuff.  She returned to work on June 8, 2009.  Between June 8th and July 20th, she again sought accommodations in the form of a driver.  She specifically asked Beaulieu to approve allowing a friend to drive her for a minimal charge.  This accommodation was denied and Winslow was again directed that she could either skip meetings or attend via video or

---

[1] While Winslow did not have a secretary during the summer of 2008, it is undisputed that Aroostook County contracted with Ann Perrault, a local accountant, to work on the WIA program in the summer of 2008. Additionally, Linda Richardson, another Aroostook County employee, worked on the WIA program.  There is a factual dispute between the parties as to whether the work done by Perrault and Richardson was work that would have otherwise been done by a secretary during the same time period.  (See Def. SMF (ECF No. 30) ¶26 & Pl. SMF (ECF No. 41) ¶26.)

telephone.  Likewise, Winslow's request for a secretary was denied in the period following her third surgery.

Winslow was never disciplined in any way as a result of her driving restrictions or the resulting limitation on her appearing in-person at meetings.  In fact, during her recoveries from her spine surgery and her two shoulder surgeries, Winslow did a lot of work from home.  Because the Executive Director position involved a lot of paperwork, phone calls and computer work, Winslow was able to perform the essential functions of her position from home.

A few weeks after Winslow's first surgery, Winslow began having excruciating pain in her hip near the donor site used for her spinal fusion.  The resulting pain caused her to have difficulty walking and doing stairs as well as falling down.  On May 21, 2009, Winslow informed Doug Beaulieu of the fact that she had what was thought to be a tumor in her hip.  However, Winslow subsequently learned she suffered an avulsion fracture after her spine surgery.  As a result, a large chunk of bone had broken away from the hip donor site and became caught in the tendons and muscles of her leg.

On July 27, 2009 (approximately a month after recovering from her third surgery), Winslow met with Beaulieu and discussed her plans for hip surgery to repair her avulsion fracture.  Beaulieu told Winslow that he did not want her to have the hip surgery done because it was "too risky."  Winslow's perception of Beaulieu's expressed concern was that he did not want her to have the surgery because of the risk that she would miss additional days of work.  By this point, Winslow generally felt that Beaulieu "had issues" with her needing surgery and was rude to her as a result.  (Winslow Dep. at 130-31.)  Ultimately, Winslow postponed her hip surgery because she was afraid she would lose her job.  While Winslow was subject to restrictions as a

result of her hip problems, she did not explicitly request accommodations solely because of the hip condition.

Winslow did have a fourth surgery on her hip on February 4, 2010.  She first informed Beaulieu that she had this surgery via email on February 5, 2010.  It does not appear that Winslow returned to work any time between this fourth surgery and February 12, 2010, which was her last of employment with the County of Aroostook.

**Winslow's Requests for Secretarial Assistance**

When Winslow began as Executive Director, she had a secretary, Wendy Gauvin. Gauvin left her position in May 2008.  Upon Gauvin's departure, an ad for a new secretary was placed and applications were received.  These applications were reviewed by Winslow, Linda Richardson, another Aroostook County employee, and Diane Gove, who was employed as Beaulieu's secretary.  Suitable candidates were interviewed by the group and an offer was extended to one candidate.  He declined the position; as did a second candidate.  Winslow's effort to secure secretarial assistance via an "older worker program" was similarly unsuccessful. Christina Theriault, Aroostook County's Human Resource Coordinator, also attempted unsuccessfully to fill this secretarial position via a temporary work agency but found no acceptable candidates.  Winslow requested but did not receive approval for a secretarial position with an increased salary.  The unsuccessful 2008 secretarial search ended when Winslow went out on medical leave in late June 2008.  However, Winslow made continued requests for secretarial assistance to Beaulieu and to other members of LWIB.

Winslow included funds for a secretary in her proposed 2010 annual budget, which was approved by Beaulieu and the County in late 2009.[2]  This approved budget would have allowed

---

[2] There is a factual dispute as to whether Winslow included a similar budget line for a secretary in her proposed 2009 budget.  Winslow claims she did include a secretary only to have that line item removed from her 2009 budget

Winslow to hire a secretary as of January 1, 2010.  Ultimately, Aroostook County never hired a replacement secretary for the remainder of the time that it acted as the fiscal agent for LWIB.  However, as Executive Director, Winslow believed she needed a secretary and would have needed a secretary even if she had not had periods of disability for which a secretary would have provided requested accommodations.

### The Federal Monitoring Visit

Between November 17, 2009 and November 19, 2009, Winslow participated in a federal monitoring visit of the LWIB program.  The purpose of the visit was to allow the United States Department of Labor to ensure that the program was operating in compliance with federal law.  The federal monitoring visit was led by Tim Theberge.  Mary McLean and Dennis Lonergan also participated on behalf of the federal government.  The monitoring team also included state monitors:  Steve Duval, Rob Schenberger, Merle Davis, and David Kline.   During the visit, Winslow learned from Theberge that it was a violation of federal law for her to report to the County Administrator rather than the LWIB.

On November 19, 2009, the monitoring team held an exit interview.  In addition to the federal and state monitors, the interview was attended by Winslow, Torry Eaton, Patty Perry, Linda Richardson, Connie Sandstrom, the director of ACAP, as well as a financial representative of ACAP.  As part of the exit interview, Theberge asked to speak directly with the County Administrator.  Winslow brought Theberge to Beaulieu's office.  During that meeting, Theberge indicated that LWIB's Executive Director could not report to the County Administrator in the absence of an express written agreement with LWIB.  Following the exit interview, Beaulieu

by Doug Beaulieu and Linda Richardson.  (See Winslow Dep. (ECF No. 28) at 72; Winslow Aff. (ECF No. 41-1) ¶9.)  Beaulieu asserts that Winslow did not request a secretary again until submitting her 2010 proposed budget.  (Beaulieu Dep. (ECF No. 25) at 34 & 94.)  In any event, the record does not indicate that Winslow's budget requests reflected requests for reasonable accommodations.  Rather, they reflected her judgment that the LWIB and WIA program needed a secretary to further their objectives.

requested that Winslow, in her role as Executive Director, type up notes from the exit interview, which she did.  Winslow's Exit Interview Notes (ECF No. 30-2) totaled five pages.  Winslow listed five "findings" from the federal monitoring visit, each of which reflected a noted non-compliance that would require responsive action.  The fifth finding:  "My job description indicated I am supervised by the County Administrator, however, I work for the Board, who supervise me."  Initially, Winslow provided the notes to Beaulieu.  Upon Beaulieu's request, she then sent a copy of the notes to Norm Fournier and Chris Gardner (the CLEOs) and Barry McCrum (the Chair of LWIB).  Upon Beaulieu's later request, Winslow provided the notes to the entire LWIB at a meeting held on January 15, 2010.

For his part, following the federal monitoring visit, Beaulieu began discussions with CLEO Norm Fournier to make Northern Maine Development Commission (NMDC) the grant sub-recipient.  Around this same time, he also reached out to Robert Clark, a LWIB board member who was also the Executive Director of NMDC.  Clark had been previously approached about the possibility of becoming the grant sub-recipient under LWIB's previous Executive Director, Pat Boucher.  Additionally, Beaulieu and Boucher had discussed transferring LWIB to NMDC during Boucher's tenure.

Then, on December 2, 2009, Beaulieu relayed some of the federal monitoring findings, including the finding that the Executive Director must report to LWIB, at the Aroostook County Commissioners' Meeting.  This meeting was open to the public and attended by Paul Adams, County Commissioner; Norman Fournier, County Commissioner; Paul Underwood, County Commissioner; Jim Madore, Sheriff; Bryand Jandreau, Facilities Manager; and Paul Bernier, Public Works Director.  The minutes of this public meeting were adopted on December 16, 2009

and posted on-line for public review.  In relevant part, the minutes described Beaulieu's report on the federal monitoring visit as follows:

> The Workforce Investment Act (WIA) monitoring visit by the Feds was completed during the week of November 15, 2009.  The Federal Monitors looked at both programmatic and financial compliance of the WIA program.   The County Administrator reviewed some of the more substantive findings, particularly as they related to the County of Aroostook.  As the grant recipient of the program, it appears the County has limited ability to implement accountability measures to protect its own interests.   For example, one of the findings is that the Executive Director should, under the law, report to the Board, not the County Administrator.  From a financial standpoint, the Federal Monitor found that our financial accounting system is insufficient to meet the need of federal requirements.   That is, our current accounting system is ill-suited to provide detailed programmatic tracking of WIA subrecipients.  The County Administrator also advised that the State Monitor has recently advised us that our Local Area was being considered as a "high risk grant recipient" and new contractual obligations would be implemented shortly.  In sum, both the proposed findings and the contractual requirements are prompting this organization to rethink its role as grant recipient/subrecipient for Local Area 1.

(Dec. 2, 2009 Minutes (ECF No. 30-3) at Page ID # 838.)

Following the federal monitoring visit, Winslow repeatedly objected to attempts by Beaulieu to act as her supervisor and sought to report to LWIB directly as much as possible. Winslow also learned that it was very likely that NMDC would be the new grant sub-recipient on or about November 23, 2009.

Unbeknownst to Winslow at the time, Robert Clark of NMDC had reviewed the relevant law and concluded that the fiscal agent could, in fact, have the authority to hire, supervise, and fire LWIB's Executive Director.   On December 15, 2009, Robert Clark completed a draft transition plan for the LWIB's fiscal agent reflecting a tentative plan to notify existing staff of termination on December 31, 2009 and thereafter advertise for a program director.  (See 12/15/2009 Draft Transition Plan (ECF No. 41-9).)  On December 29, 2009, Beaulieu forwarded to Robert Clark a string of emails he had exchanged with the CLEOs regarding finalizing an agreement to change the fiscal agent to NMDC.  In relevant part, those emails included Chris

Gardner's expressed concerns about whether LWIB had been informed of these changes.   In response, Beaulieu's email indicated that he was seeking further guidance as to how to communicate the upcoming change of the fiscal agent to the LWIB board members.   He indicated that direct communication with the LWIB was normally the function of the Executive Director.   He noted that the federal findings that the Director should not report to the County Administrator had "made [his] ability to supervise the concerned individual difficult, if not impossible" and that he was "unable to secure compliance" by the Executive Director. (12/29/2009 Email (ECF No. 41-11) at Page ID 1168.)

On December 31, 2009, Winslow emailed the board and associate members of LWIB a memo entitled "Opportunity" (ECF No. 30-4) in which she reported the results of the federal monitoring visit.   In this memo, Winslow noted "a number of changes identified by the Federal auditors."   She acknowledged that one day earlier LWIB members had received a separate memo from Beaulieu, McCrum, and the two CLEOs regarding "a change in the fiscal agent from Local Area 1" that included a proposal that NMDC become the fiscal agent.   However, Winslow further clarified that the LWIB had multiple oversight responsibilities regardless of who the CLEOs designated as the fiscal agent for WIA funds.   In order to discuss further, she invited the board members to request an interim meeting to be held prior to the regularly scheduled quarterly meeting on February 11, 2010.

Beaulieu responded to Winslow's December 31, 2009 email with an email to Chris Gardner, which read:

> This is insubordination.  Barry McCrum is upset.  We are working on it.  I think it's all pretty self-evident where this was all coming from.

(12/31/09 Email (ECF No. 41-7) at Page ID 1158.)  Likewise, Beaulieu exchanged emails with one LWIB board member, Richard Cost, in which Beaulieu indicated:

We are in an extremely tenuous situation with her.  During the Fed. Monitoring, the Feds told me personally that she cannot report to me; she reports to the board.  Since then, all hell has broken loose.  I am working with Barry, Norm, Chris and Bob to develop an appropriate strategy.  I may be in touch.

The issue of designation of a new gran sub-recipient is clearly up to the CLEOs and I am advising them to make that designation ASAP.  I have been working for the last month on effecting this change.  That is her motivation behind all of this.  She wants the program to go to NMCC, not NMDC.

(1/1/10 Email (ECF No. 41-8) at Page ID # 1160 (with copy to Barry McCrum, LWIB Chair).)

Winslow's "Opportunity" email was also received by Robert Clark of NMDC because of his role as a member of LWIB.  In a subsequent email exchange with LWIB Chair Barry McCrum, Clark responded:  "If I was her boss she would be fired immediately for insubordination.  I can't believe she did this."  (12/31/09 Email (ECF No. 41-25) at Page ID# 1236.)

On January 4, 2010, Beaulieu met with Winslow and provided her a memo reprimanding her for the "Opportunity" email.  The memo was copied to Barry McCrum, Board Chair, and the CLEOs and had been transmitted to each of them by email prior to the meeting.  The memo reaffirmed that Winslow would be required to report to Beaulieu while she remained in the employ of Aroostook County Government.  After meeting with Winslow, Beaulieu sent a follow-up email to the same group rescinding his memo to Winslow.  In this email, Beaulieu indicated that the meeting had been "productive" and that rescinding was "in the best interest of the LWIB."  (1/4/2010 Email (ECF No. 41-12 at Page ID# 1172.)  Nonetheless, Winslow did prepare and send a response memo to Beaulieu, McCrum, the CLEOs and all of the Aroostook County Commissioners, in which she indicated that her "Opportunity" email was sent in accordance with the federal monitors' directives and her job description.  She indicated that any suggestion that she had acted outside the protocol of her job was "slanderous."  (1/5/2010 Memo

(ECF No. 41-5) at Page ID 1152-53.) Winslow's memo also stated that she believed her "Opportunity" email to the Board was an attempt to comply with federal law that required her to report to LWIB. McCrum subsequently transmitted the rescinded reprimand memo and Winslow's responsive memo to Robert Clark. (See 1/5/2010 Email (ECF No. 41-12) at Page ID # 1172 & 1/6/2010 Email (ECF No. 41-13) at Page ID # 1177.)

An interim board meeting of the LWIB was held on January 15, 2010. At the meeting, Winslow, in her role as LWIB's Executive Director, reported on the results of the federal monitoring visit and passed out copies of the WIA legislation. Robert Clark disagreed with Winslow's presentation regarding the WIA and indicated that she was incorrect and "disgusting." At the end of the meeting, the Board took an advisory vote to transfer the administration of LWIB from Aroostook County to NMDC. The vote of the Board was a tie and, as chair, McCrum, broke the tie and voted in favor of the transfer to NMDC. Additionally, by agreement dated January 14, 2010, the CLEOs designated NMDC to serve as the local agent and grant sub-recipient for WIA funds. This agreement states that NMDC will serve as the staff of the LWIB "and perform duties assigned by CLEOs and LWIB." (Local Area I Gran Sub-recipient Agreement (ECF No. 30-5).)

By letter dated January 15, 2010, the LWIB transmitted their agreement to the Maine Department of Labor seeking the state's assistance to "effectuate this change in a timely manner." (1/15/201 Letter (ECF No. 41-14) at Page ID# 1181.) Stephen Duval, Division Director of the Maine Department of Labor (and a member of the monitoring team), responded to the January 15th letter seeking clarification of the CLEO's proposed assignment of LWIB staffing to NMDC. (See 1/20/2010 Email (ECF No. 41-17) at Page ID# 1188.)[3] Beaulieu

---

[3] To the extent that Defendant has invoked SEC v. Ficken, 546 F.3d 45, 53 (1st Cir. 2008) and made requests to strike statements of material fact based on the argument that various correspondence authored by the CLEOs, the

forwarded the Duval email to Robert Clark indicating that Clark should "hold off on advertising" for a new Executive Director and speculating that he may have "underestimated someone's influence in Augusta,"  which appeared to be a suggestion that Winslow may have been in contact with state officials. (Id.)

In a January 19, 2010 email to two LWIB board members who could not attend the January 15th meeting, Winslow provided the following summary of the meeting and her views on the current situation:

> Bob made it clear at the Board meeting that he does not intend to take me when he takes over the LWIB. This is a violation of Federal Law, which also was addressed in our recent Federal monitoring. The monitors found that my job description illegally indicated that I am supervised by the County Administrator.  This was, in fact, their first finding during the visit when they asked to see my job description. They made it very clear to me that I work for the full Board of Directors, not the Fiscal Agent, and cited the specific section of the WIA Law – (which, by the way, I pointed out during the Board meeting). It made no difference, Bob Clark is usurping the Federally mandated responsibility of the Board in determining not to maintain my employment when he becomes Fiscal Agent. The Board did not decide to terminate my employment – rather this decision was made without their input in spite of them being my Federally designated employers. This decision had already been made behind closed doors well before the Board meeting – and the Board members were not given the opportunity to even know this decision was being made…. Obviously, beyond my own concerns for illegally being terminated from my employment, I have grave concerns that NMDC is taking on the role mandated to the Board of Directors – just as the County of Aroostook had done…. The "good old boys" have tried hard to silence me as well, through discrediting me with incredible and outrageous lies. They know that I will tell you all the truth and they don't want that to happen…

---

Maine Department of Labor (Steve Duval) or the United States Department of Labor (Tim Theberge) is inadmissible hearsay, the Court denies those requests.  In the Court's view, correspondence authored by Government officials in the course of fulfilling their official duties qualifies for admission under F.R.E. 803(6)(A) (record of regularly conducted organization activity) or F.R.E. 803(8)(public records) or F.R.E. 807 (residual exception).  Alternatively, the Court accepts Plaintiff's response that all of the objected-to letters and emails are being offered for the effect each had on various recipients, rather than for the truth of the propositions stated therein.  (See Def. Reply SMF (ECF No. 52) ¶¶ 148 & 150; Pl. Response to Request to Strike (ECF No. 53) ¶¶ 148 & 150.)  The Court notes that all of Defendant's other requests to strike have been readily resolved by the Court's review of the underlying cited record and the Court's factual recitation reflects its review of the said record.  (See Defs. Reply SMF ¶¶ 125, 131 & 155; Pl. Response to Request to Strike ¶¶ 125, 131 & 155.)

(Pl. Statement of Add'l Facts (ECF No. 41) ¶147.)[4]

Additionally, upon receiving notice that NMDC intended to advertise for the new Executive Director after it became fiscal agent for the LWIB, Winslow sent an email to Tim Theberge asking for clarification as to whether the fiscal agent had the power to terminate the LWIB Executive Director.  In a preliminary response email, dated January 26, 2010, Theberge wrote to Winslow, in relevant part:  "the Executive Director of a local area can only be removed by local board members and/or the state board if there have been significant compliance issues." (1/26/2010 Email (ECF No. 41-2) at Page ID# 1140.)

**Winslow's Termination**

Winslow was terminated from her position as LWIB's Executive Director by Beaulieu via a letter dated February 4, 2010.  In relevant part, Beaulieu's letter noted that on January 15, 2010, the CLEOs had signed an agreement designating the NMDC as the new grant subrecipient for the local WIA program effective February 15, 2010.  The letter went on to explain:

> Because the County of Aroostook will no longer be involved with the administration of this program, at the February 3, 2010 County Commissioners' Meeting, the Aroostook Board of County Commissioners approved termination of your employment as Executive Director of Workforce Investment Act Program for Local Area 1 effective February 12, 2010.

(Feb. 4, 2010 Ltr. (ECF No. 30-6).)  A copy of this letter went to each CLEO as well as to each Aroostook County Commissioner.  No copy was sent to LWIB and there is no evidence that LWIB ever voted to terminate Winslow as Executive Director.  Winslow received notice of her termination via email on February 4, 2010; that same day, she had her earlier noted hip surgery.

---

[4] The Court notes that this email and its contents are included in the Court's factual recitation pursuant to Defendant's admission.  (See Def. Reply SMF (ECF No. 52) ¶ 147.)  Nonetheless, Plaintiff did not provide a proper citation to the actual email leaving the Court unable to definitely determine whether Plaintiff would be able to admit the content of this email in suitable evidentiary form at trial.

On March 8, 2010, Ryan Pelletier began working as the Workforce Development Director at NMDC. Pelletier was one of four candidates interviewed for this position by Robert Clark and Ruby Bradbury. Winslow was one of the other four candidates interviewed for the position. By all accounts, Pelletier is not disabled and had never complained about illegal conduct. On April 15, 2010, NMDC and LWIB signed a management and services agreement.

On May 26, 2010, Winslow filed her Maine Human Rights Act Complaint against Aroostook County and NMDC in which she alleged discrimination based on disability and whistleblower retaliation.

## III.    DISCUSSION

Plaintiff's Complaint states two claims against Defendant Aroostook County. In Count I, she alleges that Aroostook County failed to accommodate her disability and terminated her because of her disability in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* and Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4571 *et seq.*[5] In Count II, she alleges that Defendant Aroostook County terminated her employment in violation of the Maine Whistleblower Protection Act (MWPA), 26 M.R.S.A. §§ 831 *et seq.*, (Count II). Aroostook County seeks summary judgment on both claims.

### A.  Count I: Disability Discrimination

Plaintiff's disability discrimination claim seeks recovery for both her termination and a failure to provide reasonable accommodation. The Court separately considers these two theories.

---

[5] With the exception of the statute of limitations issue, the Court's analysis of the federal ADA claim applies with equal force to the state MHRA claim. See, e.g., Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 n. 1 (1st Cir. 2007) ("Maine courts apply the MHRA in accordance with federal anti-discrimination law.").

Traditionally, courts assessing summary judgment on disability discrimination claims involving indirect evidence first consider whether plaintiff presents the three-factor prima facie case required under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Thus, "the plaintiff must show that he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of his disability." <u>Jones v. Nationwide Life Ins. Co.</u>, 696 F.3d 78, 87 (1st Cir. 2012) (*citing* <u>Richardson v. Friendly Ice Cream Corp.</u>, 594 F.3d 69, 74 (1st Cir. 2010); <u>García–Ayala v. Lederle Parenterals, Inc.</u>, 212 F.3d 638, 646 (1st Cir. 2000)). If the prima facie case is established on the summary judgment record, a presumption of discrimination arises. Then, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. . . . If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's justification is mere pretext cloaking discriminatory animus." <u>Ramos-Echevarria v. Pichis, Inc.</u>, 659 F.3d 182, 186-87 (1st Cir. 2011) (internal citations omitted).

### 1. Termination

Assuming for the moment that Winslow's various orthopedic conditions qualify as a disability (the first prong),[6] it is not disputed in the context of the current motion that Winslow was able to perform the essential functions of the LWIB Executive Director position (the second prong). (<u>See</u> Def. Mot. (ECF No. 29) at 12.) The Court is left to consider whether Winslow's disabilities caused her termination. In the Court's view, Plaintiff has failed to establish this third element of the prima facie case. However, even assuming that the evidence can be viewed as

---

[6] Defendant devotes a portion of its Motion to arguing that Plaintiff cannot establish that she is disabled under the ADA or MHRA. (<u>See</u> Def. Mot. at 8-9.) However, the Court finds the record readily supports the conclusion that Plaintiff has presented trialworthy evidence to support her assertion that she is disabled. (<u>See</u> supra II.) Therefore, the Court focuses its analysis on the other plausible arguments presented by Defendant.

establishing that Plaintiff's termination was motivated in some small part by her disability, it is readily apparent on the current record that Defendant has articulated a legitimate, non-discriminatory reason for its action.  Therefore, the burden is returned to Plaintiff.  In the context of the current record, the Court concludes that there is simply not a trialworthy issue that the County's stated reason for terminating Winslow from its payroll was pretext.

Ultimately, Plaintiff can only survive summary judgment if a reasonable fact finder could conclude that disability was the but-for cause of her termination.  See Palmquist v. Shinseki, 689 F.3d 66, 74-75 (1st Cir. 2012); Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, (6th Cir. 2012) (en banc);  Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 962 (7th Cir. 2010) ("[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice.")  There is no genuine dispute that the but-for cause of Winslow's termination by Aroostook County was the fact that it was no longer going to be the fiscal agent for the LWIB and, as result, would no longer have funding for the Executive Director position held by Winslow.  Plaintiff's argument that "[a] reasonable jury" might find "the County's motivation in seeking to transfer fiscal agent responsibility from itself to NMDC was primarily because it wanted to get rid of [her]" has no support in the record.  Given Winslow's own repeated assertions that the Executive Director worked directly for LWIB, there is no evidence to suggest that *Aroostook County* could have continued her employment following the LWIB's decision to move its money and staffing to NMDC.  In short, the Court concludes that Plaintiff cannot present a trialworthy claim that she was terminated based on her alleged disability and Aroostook County is entitled to summary judgment on this termination portion of Count I.

### 2.   Failure to Provide Reasonable Accommodations

Under both the ADA and the MHRA, the failure to provide a reasonable accommodation for the known physical or mental limitations of an otherwise qualified individual with a disability is considered to be discrimination. 42 U.S.C. § 12112(b)(5)(A); 5 M.R.S.A. § 4553(2)(E).   A plaintiff asserting such a discrimination claim must establish four elements:  (1) that she is a "qualified individual with a disability" under the applicable statute; (2) that the employer is subject to the statute; (3) that "the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations;" and (4) "that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment." Gomez–Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 664-65 (1st Cir. 2010) (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264–65 (1st Cir. 1999)).   "Ordinarily, the employer's duty to accommodate is triggered by a request from the employee." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007).  As to any request, Plaintiff must show:  (1) a "sufficiently direct and specific" accommodation was made, and (2) that the request "linked" the accommodation to the present disability.  See id. (citing Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)).

### a.   Statute of Limitations

Before turning to whether Plaintiff can satisfy those elements, the Court must first consider the statute of limitations.  Because Plaintiff filed her initial complaint with the Maine Human Rights Commission on May 26, 2010, Defendant initially argues that her federal claims are barred to the extent she alleges denials of reasonable accommodations prior to July 30, 2009. See 42 U.S.C. § 2000e-5(1) (providing that a claim must be filed "within 300 days after the alleged unlawful employment practice occurred").  Similarly, Defendant argues that any MHRA

claim must fall within the applicable state statute of limitations of two years.  See 5 M.R.S.A. § 4613(2)(C).  In response, Plaintiff acknowledges that as a result of the statute of limitations she may not seek independent recovery for failure to accommodate her disability prior to July 30, 2009 (for federal claims) and prior to April 19, 2009 (for state claims).  (See Pl. Response (ECF No. 40) at 9.)[7]

**b.  ADA Claim**

On the factual record presented in connection with summary judgment, the July 30, 2009 statute of limitations sounds the death knell for Plaintiff's ADA claims against Aroostook County for failure to provide reasonable accommodations.  By this date, Plaintiff had recovered from her third surgery.  To the extent that the factual record can even be read to suggest that Plaintiff had a disability that required accommodation after July 30, 2009, there is nothing in the record that would allow a fact finder to conclude that Plaintiff made sufficiently direct and specific requests for accommodation that were linked to her residual disabilities on or after of July 30, 2009.  Thus, the Court concludes that Plaintiff's ADA claim based on failure to provide reasonable accommodations is barred by the statute of limitations.

**c.  MHRA Claim**

Turning to Winslow's state claim for failure to provide reasonable accommodations, the look back period allowed under the applicable statute of limitations is longer and encompasses requests for accommodation made in connection with Winslow's third surgery.  The summary judgment record reflects that requests for accommodation in the form of a driver and a secretary

---

[7]  To the extent that Plaintiff maintains that she would nonetheless seek to admit evidence of failures to accommodate prior to these dates in accordance with F.R.E. 404(b), the Court need not resolve this issue in connection with summary judgment.  Because the factual record is necessarily construed in Plaintiff's favor at this stage, the positive impact of this evidence (which Plaintiff asserts tends to show the "state of mind of Doug Beaulieu" at the time of the alleged failure to accommodate and termination) is assumed.  (Pl. Response at 9.) Nonetheless, evidence of failure to provide accommodations prior to the statute of limitations cannot by itself create a triable issue of fact if there is no evidence showing a failure to accommodate during the relevant time period.

were made following this surgery in June 2009.  Kezer v. Cent. Maine Med. Ctr., 40 A.3d 955, 963 (Me. 2012) ("[A] significant and material change of circumstances involving the employee's disability or the employer's ability to accommodate the disability, and a subsequent request for a reasonable accommodation based upon such changes followed by a denial of that request, would constitute a new discrete act of alleged discrimination that would establish a starting point for a new statute of limitations period.").

With respect to the request for a driver, the Court believes that the alternative accommodation allowed by Aroostook County reflected a "good faith effort" to provide "an equally effective opportunity" to Winslow.  5 M.R.S.A. § 4613(2)(B)(8)(b); see also Kezer v. Central Maine Med. Ctr., 40 A.3d 955, 963-64 (Me. 2012).  Winslow was allowed to skip in-person appearances that required long drives.  In lieu of in-person meetings, Winslow had the opportunity to teleconference and video conference.  Winslow was also allowed telework from home, which further minimized her need to drive.  Given these accommodations, no reasonable fact finder could conclude that Aroostook County's denial of a driver following Winslow's third surgery amounted to a failure to provide reasonable accommodations.  Likewise, on the record presented, no reasonable fact finder could conclude that Aroostook County's failure to provide a driver affected the terms, conditions, or privileges of the plaintiff's employment.

Turning to the request for a secretary, the summary judgment record lacks enough evidence for the Court to conclude that there is a trialworthy issue that the failure to provide a secretary after she returned to work on June 8, 2009 affected the terms, conditions, or privileges of the plaintiff's employment.  Likewise, the record lacks any detail that would allow the Court to conclude that Plaintiff's secretary request following her third surgery was sufficiently direct and specific as well as linked to her disability.  What is apparent on the record now before the

Court is that Plaintiff had mixed motives for wanting a secretary. Throughout her tenure as Executive Director, she continuously believed that a secretary would assist in the administration of the work of the LWIB. At various times, she additionally believed a secretary would be a reasonable accommodation as she recovered from various surgical procedures. Under these circumstances, it is not enough for Plaintiff to present evidence that she requested a secretary in a specific time period. Rather, given her burden, she must show that the secretarial request was specifically and directly made and that the request was linked to her then-existing disability. Plaintiff has failed to meet this mark on the record presented.

For all of the reasons just described, the Court concludes that Defendant Aroostook County is entitled to summary judgment on Count I.

### B.  Count II:  Whistleblower Discrimination

Plaintiff argues that her termination was also prompted by her attempts to report that the LWIB was violating federal law when it allowed its fiscal agent to supervise, hire and fire LWIB's Executive Director. The Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S.A. § 831 *et seq.*, states in relevant part:

> No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith, or a person acting . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of . . . the United States.

26 M.R.S.A. § 833(1)(A). As it relates to Winslow's claim against Aroostook County, "the protection afforded by the MWPA is 'unambiguously limit[ed] . . . to (1) employees (2) who report to an employer (3) about a violation (4) committed or practiced by that employer.'" Bodman v. Maine, Dept. of Health & Human Services, 787 F. Supp. 2d 89, 109 (D. Me. 2011) (*quoting* Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1054 (Me. 2008)); see also

Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 217 (D. Me. 2002) (explaining that "*absent from the MWPA is protection for an employee who is fired merely because he refuses to obey a directive he reasonably believes to be illegal*").

An employee claiming discharge or discrimination in violation of the MWPA may pursue a claim for unlawful discrimination under the MHRA. See 5 M.R.S.A. § 4572(1)(A). "To prevail on an MHRA claim for whistleblower discrimination, [Plaintiff] must show that she engaged in activity protected by the WPA, she experienced an adverse employment action, and a causal connection exists between the protected activity and the adverse action." Fuhrmann v. Staples Office Superstore E., Inc., 2012 ME 135, --- A.3d --- (Me. 2012) (citing Currie v. Indus. Sec., Inc., 915 A.2d 400 (Me. 2007)). Once these three elements are established, Defendant must present "a legitimate, non-retaliatory motive for the adverse employment action." See Bodman, 787 F. Supp. 2d at 109 (*citing* DiCentes v. Michaud, 719 A.2d 509, 514 (Me. 1998); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)). "The final burden to prove the existence of the causal nexus remains with the plaintiff." LePage v. Bath Iron Works, 909 A.2d 629, 636 (Me. 2006) (citing DiCentes, 719 A.2d at 515). Under this burden shifting paradigm, "establishing a factual dispute as to whether a causal connection exists between the report protected by the [M]WPA and the adverse employment action" will allow a plaintiff to survive summary judgment. Halkett v. Corr. Med. Servs., Inc., 763 F. Supp. 2d 205, 220-21 (D. Me. 2011) (quoting Stanley v. Hancock Cty. Comm'rs, 864 A.2d 169, 177 (Me. 2004)).[8]

---

[8] In the absence of controlling case law specific to the MWPA, the Court may also look to similar federal whistleblower laws for guidance. See Maine Human Rights Comm'n v. Maine Dept. of Defense & Veterans' Services, 627 A.2d 1005, 1007 (Me. 1993) ("The Maine Whistleblowers' Protection Act is also comparable to its federal counterpart, 5 U.S.C.A. § 2302(b)(8).")

Plaintiff attempts to assert that her reports to Beaulieu and Aroostook County qualify as her reports of violations committed by her employer.  The Court first notes that under this theory the initial in-person report directly from the federal monitor to the County Administrator would not qualify as a report made by Winslow.  To the extent Winslow argues that her later iterations of the findings of the federal monitors to LWIB and/or Beaulieu qualify as reports made to her employer, the Court does not agree with these characterizations.  First and foremost, these reports most accurately are described as Winslow simply fulfilling her duties as Executive Director.  See, e.g., Capalbo v. Kris-Way Truck Leasing, Inc., 821 F. Supp. 2d 397, 419 (D. Me. 2011) (granting summary judgment when employee's MWPA claim was based on required reports he made at the direction of his employer).  Winslow's exit interview notes, which are her first written report of the findings of the monitoring visit, were drafted and distributed pursuant to the express directions of the County Administrator.  Winslow also included information regarding the monitoring visit findings in her December 31, 2009 "Opportunity" email to the LWIB.  However, this email amounted to Winslow acting in accordance with the directive she had received from Theberge to report directly to the LWIB.  As a result, the Court cannot find any report by Winslow that was a genuine attempt to "blow the whistle" on a violation of the rules for the WIA program for which she served as Executive Director.  Rather, the record reflects a genuine effort by Winslow during her tenure as Executive Director to ensure she followed the rules as she understood them.

Additionally, the facts do not present a situation in which violations would have been hidden from public view or correction in the absence of Winslow's reports.  To the contrary, Winslow was simply reiterating information that quickly became widely known and publicly available following the monitoring visit.  The record reflects that this public dissemination would

have occurred without any "whistleblowing" by Winslow.  Under these circumstances, this case is not analogous to Parks v. City of Brewer, 56 F. Supp. 2d 89 (D. Me. 1999).  In Parks, the city employer was denied summary judgment on a whistleblower claim although they argued that Plaintiff was not the first person to report the violation.  See id. at 102-03.  In denying summary judgment, the Court explained that the prior report was by the employee essentially seeking approval of the violation.   Thus, the prior report "cannot fairly be characterized as whistleblowing" and Parks appeared to be the first person to report that the approval sought was in fact a violation of law.  Id. at 103.  In this case, there is no evidence suggesting that Winslow's reports were of a substantively different nature than the prior reports of the results of the federal monitoring visit.  While the MWPA might be read to extend protection to multiple employees who report the same violation, the Court does not believe it protects the repeating of publicly available information.  See, e.g., Meuwissen v. Dep't of Interior, 234 F.3d 9, 13 (Fed. Cir. 2000) ("A disclosure of information that is publicly known is not a disclosure under the WPA. The purpose of the WPA is to protect employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information.");  Helbig v. City of Bowling Green, 371 S.W.3d 740, 743 (Ky. Ct. App. 2011), review denied (Aug. 15, 2012) (dismissing claim under Kentucky's Whistleblower Protection Act that was based on an employee's disclosure of "publicly available information").  Cf. Currie, 915 A.2d at 407 & n.7 (concluding that an employee's internal report of dumping qualified as a "report" under the MWPA when "management first learned of the dumping through his report" even though DEP had received earlier reports of the same dumping).

In this case, the substantive information Winslow claims to have disclosed was first publicly announced on December 2, 2009 at an Aroostook County Commissioner's Meeting.

Following that meeting, it is clear that Aroostook County, in its role as the "employer" who is being claimed to have committed the MWPA violation, was engaged in reasonable efforts to correct that violation.   See 26 M.R.S.A. § 833(2) (noting that whistleblower protection for reports to public bodies applies only when "the employee has first brought the alleged violation . . . to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation").   Under these unique circumstances, the Court concludes that Winslow cannot as a matter of law succeed on her Count II claim under the MWPA.   Rather, the Court finds that Winslow's multiple reports of the results of the federal monitoring were done in the ordinary course of fulfilling her duties.   Moreover, Winslow's reports after the beginning of December amount to reports of publicly available information, which Aroostook County was reasonably attempting to correct.

Given the Court's conclusion that Plaintiff's reports do not qualify as whistleblowing, the Court need not address Defendant's third basis for seeking summary judgment on Count II; namely, that Plaintiff cannot establish a causal connection between her alleged whistleblowing and her termination.   (See Def. Mot. for S.J. at 17-18.)   The Court acknowledges that there is a causal connection to the extent that the changes to the WIA program and its fiscal agent were an attempt to correct the violations Winslow claims to have reported.   As a result, it would appear that Winslow was terminated as part of Aroostook County's effort to cease its involvement with the operation of the WIA program following reports that the County's involvement had not complied with federal law.   While Winslow in hindsight considers this action retaliatory, it is at least equally likely that Aroostook County's actions were motivated by a simple desire to respond to the violations that came to light in November 2009. [9]

---

[9] In the end, this factual dispute as to motivation is not material.  The Court admits that the "causal connection" prong is not amenable to resolution on the summary judgment record particularly in light of Plaintiff's arguments

Having concluded that Winslow's alleged reports do not qualify for whistleblower protection under the MWPA, the Court concludes Defendant is entitled to summary judgment on Count II.

## IV.   CONCLUSION

For reasons just explained, the Court hereby GRANTS Defendant Aroostook County's Motion for Summary Judgment (ECF No. 29) and ORDERS that judgment enter in favor of Defendant Aroostook County on Counts I & II of Plaintiff's Complaint.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 15th day of February, 2013.

---

regarding pretext and inferences to be made from temporal proximity.  Nonetheless, the Court observes that a fact finder allowed to weigh the evidence might well determine that the preponderance of Plaintiff's evidence does not establish the causal connection necessary to establish a whistleblower retaliation claim against this Defendant. Ultimately, the Court does not and need not resolve these genuine issues as to cause and motivation in light of its legal conclusions that the record does not support that Plaintiff can qualify for whistleblower protection.