## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DENA WINSLOW,                                      )
                                                   )
                        Plaintiff,                 )
                                                   )
v.                                                 )   Docket no. 1:11-cv-162-GZS
                                                   )
COUNTY OF AROOSTOOK &                              )
NOTHERN MAINE DEVELOPMENT                          )
COMMISSION, INC.,                                  )
                                                   )
                                                   )
                        Defendants.                )


## ORDER ON NORTHERN MAINE DEVELOPMENT COMMISSION'S MOTION
## FOR SUMMARY JUDGMENT

Before the Court is Defendant Northern Maine Development Commission's Motion for

Summary Judgment (ECF No. 31).  As explained herein, the Court GRANTS the Motion.

## I.      LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it

appears "that there is no genuine dispute as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at

248.  A "material fact" is one that has "the potential to affect the outcome of the suit under the

applicable law."   Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993)

(citing Anderson, 477 U.S. at 248) (additional citation omitted).

1

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

In the District of Maine, the parties are required to present the factual record for summary judgment in accordance with Local Rule 56.  Having reviewed the statements of material fact and supporting exhibits in accordance with Local Rule 56, the Court proceeds to lay out the

undisputed facts as well as any disputed material facts viewed in the light most favorable to Plaintiff in the following section.[1]

## II.    FACTUAL BACKGROUND

### Northern Maine Development Commission

Defendant Northern Maine Development Commission (NMDC) is a legislatively-created, public, non-profit, quasi-municipal, membership organization comprised of participating communities and counties in the Northern Maine Economic Development District. NMDC provides federal and state services at the regional and local levels.   NMDC also provides management and support to a variety of entities, including, Aroostook Municipal Association, Aroostook Partnership for Progress, Leaders Encouraging Aroostook Development, Northern Maine Finance Corporation, Momentum Aroostook, 2014 World Acadia Congress, and the Aroostook/Washington County Local Workforce Investment Board.  Robert Clark has been the Executive Director of NMDC since July 12, 1990. Ruby Bradbury has been the Director of Operations for NMDC since 2000.

Unlike its Co-Defendant Aroostook County, NMDC is not a governmental entity. NMDC and Aroostook County are not commonly owned or managed.  NMDC has no control over the County's staffing decisions or its day-to-day operations.   In short, NMDC has no involvement or control over the operations of Aroostook County and, in turn, Aroostook County has no control or involvement in NMDC's relationship with its employees.  NMDC does have an

---

[1] The Court notes that Plaintiff submitted an additional 51 statements of material fact in its opposition to NMDC's Motion.  NMDC has asked the Court to strike 23 of those statements.  In the Court's assessment, many of NMDC's requests to strike are improper and overblown.  With the exception of one request to strike discussed at *infra* note 2, NMDC's requests to strike are DENIED.  The Court notes that it considers NMDC's authenticity objections to the documents presented by way of the affidavit of Attorney Farr (ECF No. 41-6) to be meritless.  See, e.g., Daigle v. Stulc, 794 F. Supp. 2d 194, 199 n.5 (D. Me. 2011) (denying similar objections to documents presented on summary judgment by way of attorney affidavit).

established policy that prohibits discrimination on the basis of disability or any other category protected by applicable laws. NMDC employees receive a copy of the anti-discrimination policy and regular training on the policy.

**The Workforce Investment Act**

The Workforce Investment Act of 1998 ("WIA") was enacted for the purpose of creating programs designed to: increase the employment, retention, and earnings of participants in the programs; increase the occupational skill levels attained by participants in the program; improve the quality of the workforce throughout the United States; reduce welfare and dependency in the United States; and enhance the productivity and competitiveness of the United States. States that are interested in obtaining federal grants for WIA programs must establish state workforce investment boards. The state board includes the Governor, two members of each chamber of the State legislature appointed by the presiding official of each chamber, and representatives appointed by the Governor. A majority of the board members are to be representatives of business. The remainder of the board members are to be representatives of chief local elected officials, labor organizations, individuals and organizations that have experience in the delivery of workforce investment activities and youth activities, and relevant state agency heads. The Governor, in his or her discretion, may appoint other appropriate representatives. See generally 29 U.S.C. § 2801 *et seq.*; 25 M.R.S.A § 2001 *et seq.*

The Governor must also designate local workforce investment areas in which workforce activities are to be administered locally. 29 U.S.C. § 2831 (a)(1)(A). Local workforce investment boards, in partnership with local elected officials, are responsible for planning and overseeing the local programs. 29 U.S.C. § 2832. The local board is appointed by the local elected official(s) and must have a majority of business representatives, and include

4

representatives of education providers, labor organizations, community-based organizations (including those that serve the disabled and veterans), economic development agencies, and each of the one-stop partners.  The local board may include other representatives that the local elected officials determine are appropriate. 29 U.S.C. § 2832(b)(2)(B).  The Governor sets criteria for appointment of members and certifies the local board. 29 U.S.C. § 2832(b)(1); 29 U.S.C. § 2832(c)(2).  Each local area is to establish a one-stop delivery system through which core employment-related services are provided and through which access is provided to other employment and training services funded under WIA and other federal programs. The access to services must be provided through not less than one physical one-stop center in each local area, which may be supplemented by networks of affiliated sites. The programs providing services through the one-stop system are referred to as one-stop partners. 29 U.S.C. §§ 2841, 2864.  The local board is responsible for, among other things: developing and submitting a local plan to the Governor for approval; selecting one-stop operators and providers of services; developing a budget and administering the grant funds (including the designation of a local fiscal agent); overseeing local programs; negotiating local performance measures; developing statewide employment statistics systems; coordinating workforce development activities with economic development strategies; and promoting the participation of private sector employers in the statewide workforce investment system.  29 U.S.C. § 2832(d).

### The History of the WIA Program in Maine's Aroostook & Washington Counties

Maine is comprised of four (4) workforce investment regions. The Aroostook and Washington Counties Region (Local Area I), is the largest geographic workforce investment area in the state.  The Local Area I Workforce Investment Board ("LWIB") has two co-Chief Local Elected Officials (CLEOs).  During the time relevant to this case, the CLEOs were Norm

5

Fournier, a county commissioner for Aroostook County, and Chris Gardner, a county commissioner for Washington County. Barry McCrum is the chair of the LWIB and has served in that capacity for over ten years. McCrum and the other members of the LWIB are volunteers and receive no compensation for their LWIB work. Since 2008, Robert Clark, the Executive Director of NMDC, has been a member of the LWIB. From 1999 until early 2010, Aroostook County was the grant sub-recipient for the LWIB. In that capacity, Aroostook County acted as the fiscal agent for LWIB and was unofficially responsible for the administrative and financial operations of the WIA programs in Local Area 1.

On March 25, 2008, Plaintiff Dena Winslow was hired as the Executive Director of LWIB. She was offered the position by Doug Beaulieu, the Aroostook County Administrator. She began work as LWIB's Executive Director on April 3, 2008. Pursuant to the job description in place during Winslow's tenure, the County Administrator was the direct supervisor of LWIB's Executive Director and completed performance evaluations for the LWIB Executive Director. While employed as LWIB's Executive Director, Winslow received benefits from Aroostook County as well as paychecks and W-2s issued by Aroostook County. However, Aroostook County used funds received from the WIA Program to fund Winslow's salary and benefits.

While Winslow was employed as the LWIB Executive Director by Aroostook County, she had a number of surgeries, including: (1) neck surgery in June 2008, (2) right shoulder surgery in March 2009, and (3) left shoulder surgery in June 2009. During her recoveries from these surgeries, Winslow did a lot of work from home as an accommodation. Because the Executive Director position involved a lot of paperwork, phone calls and computer work, Winslow was able to perform the essential functions of her position from home. However,

Winslow also appeared at meetings exhibiting obvious signs (e.g., neck scar, arm slings and a limp) that she was receiving medical treatment.

Between July 7, 2009 and July 9, 2009, the Maine Department of Administrative and Financial Services ("Maine DAFS") conducted a field visit to review LWIB's financial management systems.  The visit revealed that the LWIB had several internal control weaknesses. As a result, the Maine DAFS required the LWIB to submit a corrective action plan to the Maine DAFS.  In a letter dated September 14, 2009, the Maine DAFS informed Dena Winslow, in her capacity as the Executive Director of the LWIB, of the deficiencies in the LWIB's internal controls and explained the corrective action that had to be taken. Copies of this September 14th letter were also sent to: Norman Fournier and Christopher Gardner, the CLEOs; Doug Beaulieu, the County Administrator for Aroostook County; Laura Fortman, the Commissioner of the Maine Department of Labor; Edmund McCann; Stephen Duval; and Dawn Mealey.

### The Federal Monitoring Visit

Between November 17, 2009 and November 19, 2009, the United States Department of Labor, Employment and Training Administration ("U.S. DOL"), conducted a compliance review of the WIA grants, which are funded by the U.S. DOL and administered by the Maine Department of Labor ("Maine DOL").  The purpose of the review was to make sure the federal laws were being followed and to evaluate, among other things, the management and administration of the WIA programs.  The federal monitoring visit was led by Tim Theberge. Mary McLean and Dennis Lonergan also participated on behalf of the federal government.  The monitoring team also included state monitors:  Stephen Duval, Rob Schenberger, Merle Davis, and David Kline.

During the first day of this monitoring visit, Winslow learned from Theberge that it was a violation of federal law for her to report to the County Administrator rather than the LWIB. This was the first time Winslow became aware that there might be noncompliance because the executive director was reporting to the grant subrecipient and not LWIB. Up until that time, Winslow had reported to Beaulieu believing that he was her designated direct supervisor. On November 19, 2009, the monitoring team held an exit interview. In addition to the federal and state monitors, the interview was attended by Winslow, Torry Eaton, Patty Perry, Linda Richardson, Connie Sandstrom, the director of ACAP, as well as a financial representative of ACAP. As part of the exit interview, Theberge asked to speak directly with the County Administrator. Winslow brought Theberge to Beaulieu's office. During that meeting, Theberge informed Beaulieu that LWIB's Executive Director could not report to the County Administrator in the absence of an express written agreement with LWIB.[2]

As a result of the compliance review, the US DOL ultimately issued a monitoring report (ECF No. 32-1 at Page ID # 947-954) to the Maine DOL on April 13, 2010. The monitoring report included a finding that LWIB had "non-compliant board staff structure." (Id. at Page ID# 954.) In relevant part, the monitoring report explained:

> Among the documents reviewed by Federal staff was the job description of the executive director of the Aroostook/Washington Counties LWIB. This document indicated that the executive director reported to the county administrator for Aroostook County. This is inconsistent with WIA Sec. 117 . . . . This is especially true in this case, since the County Administrator is not a local elected official, but is essentially staff of the fiscal agent. The executive director of a LWIB reports to the members of the board unless there is an agreement in place that shares that

---

[2] To the extent that Winslow attempts to now offer by way of her own affidavit that Theberge's discussion with Beaulieu was the result of her "initiative," Winslow's affidavit cannot be accepted to contradict and augment her prior testimony. (Winslow Aff. ¶15.) At her deposition, Winslow testified that her role in having Theberge speak with Beaulieu's was limited to taking Theberge to Beaulieu's office upon Theberge's request. (See Winslow Dep. at 165-66.) For reasons adequately stated in Defendant's Response to Statement of Fact 108, the Court has not used Winslow's affidavit and grants Defendant's request to strike the statement of fact to the extent it is solely supported by paragraph 15 of Winslow's affidavit. (See Def. Reply SMF (ECF No. 54) ¶108 (collecting cases).)

responsibility with local elected officials.  While the County may serve as the host organization for the executive director, WIA is clear that the executive director does not report to a fiscal agent.

(Id.)

### Actions Taken Following the November 2009 Monitoring Visit

Long before the April 13, 2010 Monitoring Report was issued, actions were taken to address the findings that were orally reported during the November 19, 2009 exit interview. Following the exit interview, Beaulieu requested that Winslow, in her role as Executive Director, type up notes from the exit interview, which she did.  Winslow's Exit Interview Notes (ECF No. 30-2 & Winslow Dep. Ex. 45), dated November 19, 2009, totaled five pages.  Winslow listed five "findings" from the federal monitoring visit, each of which reflected a noted non-compliance that would require responsive action.  The fifth finding:  "My job description indicated I am supervised by the County Administrator, however, I work for the Board, who supervise me."  Initially, Winslow provided the notes to Beaulieu.  Upon Beaulieu's request, she then sent a copy of the notes to Norm Fournier and Chris Gardner (the CLEOs) and Barry McCrum (the Chair of LWIB).  Upon Beaulieu's later request, Winslow provided the notes to the entire LWIB at a meeting held on January 15, 2010.

On December 2, 2009, Beaulieu relayed some of the federal monitoring findings, including the finding that the Executive Director must report to LWIB, at the Aroostook County Commissioners' Meeting.  This meeting was open to the public and attended by Paul Adams, County Commissioner; Norman Fournier, County Commissioner; Paul Underwood, County Commissioner; Jim Madore, Sheriff; Bryand Jandreau, Facilities Manager and Paul Bernier, Public Works Director.  The minutes of this public meeting were adopted on December 16, 2009

and posted on-line for public review.  In relevant part, the minutes described Beaulieu's report on the federal monitoring visit as follows:

> The Workforce Investment Act (WIA) monitoring visit by the Feds was completed during the week of November 15, 2009.  The Federal Monitors looked at both programmatic and financial compliance of the WIA program.  The County Administrator reviewed some of the more substantive findings, particularly as they related to the County of Aroostook.  As the grant recipient of the program, it appears the County has limited ability to implement accountability measures to protect its own interests.  For example, one of the findings is that the Executive Director should, under the law, report to the Board, not the County Administrator.  From a financial standpoint, the Federal Monitor found that our financial accounting system is insufficient to meet the need of federal requirements.  That is, our current accounting system is ill-suited to provide detailed programmatic tracking of WIA subrecipients.  The County Administrator also advised that the State Monitor has recently advised us that our Local Area was being considered as a "high risk grant recipient" and new contractual obligations would be implemented shortly.  In sum, both the proposed findings and the contractual requirements are prompting this organization to rethink its role as grant recipient/subrecipient for Local Area 1.

(Dec. 2, 2009 Minutes (ECF No. 30-3) at Page ID # 838.)[3]

Beaulieu also began discussing designating NMDC as the new fiscal agent with the CLEOs.  Clark began having discussions regarding the possibility that NMDC would become the fiscal agent for the LWIB by November of 2009.  On December 15, 2009, Robert Clark completed a draft transition plan for the LWIB's fiscal agent reflecting a tentative plan to notify existing staff of termination on December 31, 2009 and thereafter advertise for a program director.  In a December 28, 2009 email circulating a draft letter to ME DOL, Beaulieu indicated to Clark:  "Note how I dealt with the staffing issue.  It leaves it up to you." (12/28/2010 Email (ECF No. 41-10).)

---

[3] Although it does not appear NMDC provided the Court with the actual minutes of the December 2, 2009 Aroostook County Commissioner's Meeting, the minutes were provided to the Court in connection with Defendant Aroostook County's Motion for Summary Judgment, which the Court is simultaneously deciding by way of a separate order.  It does not appear that Plaintiff or NMDC dispute the relevant facts of the December 2, 2009 Commissioner's Meeting.  Thus, the Court cites to the minutes directly.  (See Def. SMF (ECF No. 32) ¶ 40; Pl. Response SMF ¶ 40.)

Clark first learned of the federal monitor findings from Beaulieu.  On December 29, 2009, Beaulieu forwarded to Robert Clark a string of emails he had exchanged with the CLEOs regarding finalizing an agreement to change the fiscal agent to NMDC.  In relevant part, those emails included Chris Gardner's expressed concerns about whether LWIB had been informed of these changes.   In response, Beaulieu's email indicated that he was seeking further guidance as to how to communicate the upcoming change of the fiscal agent to the LWIB board members. He indicated that direct communication with the LWIB was normally the function of the Executive Director.  He noted that the federal findings that the Director should not report to the County Administrator had "made [his] ability to supervise the concerned individual difficult, if not impossible" and that he was "unable to secure compliance" by the Executive Director. (12/29/2009 Email (ECF No. 41-11) at Page ID# 1168.)

On December 30, 2009, Clark received an unannounced visit at his office from Dena Winslow, who had come to the office to drop off a CD containing a financial policies manual. Upon entering Clark's office, Winslow spread her arms out, looked up and the ceiling and asked: "So, where are you going to put me?"   Clark responded that they were looking at doing "something different."  (Clark Dep. at 34.)

On December 31, 2009, Winslow sent Clark and all of other members of the LWIB a memorandum entitled "Opportunities" informing them what the federal monitors had found, and that the LWIB was "charged with oversight of the staff for Local Area 1."  This was the first time Clark recalls receiving a report from Winslow about the federal monitor findings.  In a subsequent email exchange with LWIB Chair Barry McCrum about Winslow's December 31st email, Clark responded:  "If I was her boss she would be fired immediately for insubordination. I can't believe she did this."  (12/31/09 Email (ECF No. 41-25) at Page ID# 1236.)  Winslow, on

the other hand, believed it was her responsibility as executive director to inform the board of the information transmitted by way of her December 31, 2009 memo.

On January 4, 2010, Beaulieu met with Winslow and provided her a memo reprimanding her for the "Opportunity" email. The memo was copied to Barry McCrum, Board Chair, and the CLEOs and had been transmitted to each of them by email prior to the meeting. The memo reaffirmed that Winslow would be required to report to Beaulieu while she remained in the employ of Aroostook County Government. After meeting with Winslow, Beaulieu sent a follow-up email to the same group rescinding his memo to Winslow. In this email, Beaulieu indicated that the meeting had been "productive" and that rescinding was "in the best interest of the LWIB." (1/4/2010 Email (ECF No. 41-12 at Page ID # 1172.) Nonetheless, Winslow did prepare and send a response memo to Beaulieu, McCrum, the CLEOs and all of the Aroostook County Commissioners, in which she indicated that her "Opportunity" email was sent in accordance with the federal monitors directives and her job description. She indicated that any suggestion that she had acted outside the protocol of her job was "slanderous." (1/5/2010 Memo (ECF No. 41-5) at Page ID # 1152-53.) Winslow's memo also stated that she believed her "Opportunity" email to the Board was an attempt to comply with federal law that required her to report to LWIB. McCrum subsequently transmitted the rescinded reprimand memo and Winslow's responsive memo to Clark. (See 1/5/2010 Email (ECF No. 41-12) at Page ID # 1172 & 1/6/2010 Email (ECF No. 41-13) at Page ID # 1177.)

Following Winslow's December 31st suggestion for an interim board meeting, the LWIB held a meeting on January 15, 2010. At the meeting, Winslow, in her role as LWIB's Executive Director, reported on the results of the federal monitoring visit and passed out copies of the WIA legislation. She also served as secretary for the meeting. Clark disagreed with Winslow's

presentation regarding the WIA and indicated that she was incorrect and "disgusting."  Based on his own review of the WIA, he interpreted the law to allow the fiscal agent to have the power to hire and fire LWIB's Executive Director.

All of the actions Winslow took to ensure compliance with the Monitoring Report were undertaken within the scope of her role as, and pursuant to her specific duties and responsibilities as, Executive Director of the LWIB.  As Executive Director, she also felt it was her responsibility to report to the Board and she also wanted to retain her position as Executive Director.  Winslow genuinely felt Clark and Beaulieu were usurping the rights of the LWIB.

On January 25, 2010, Winslow received notice that NMDC intended to advertise for the new Executive Director after it became fiscal agent for the LWIB.  Upon receipt of that notice, Winslow sent an email to Tim Theberge asking for clarification as to whether the fiscal agent had the power to terminate the LWIB Executive Director.  In a preliminary response email, dated January 26, 2010, Theberge wrote to Winslow, in relevant part:  "the Executive Director of a local area can only be removed by local board members and/or the state board if there have been significant compliance issues." (1/26/2010 Email (ECF No. 41-2) at Page ID # 1140.)  In a follow up email sent the same day, Theberge transmitted a marked up version of WAI's Section 117 indicating that "[t]he local board may employ staff." (1/26/2010 Email (ECF No. 32-1) at Page ID # 963-64.)  Separately, on January 25, 2010, Stephen Duval of ME DOL responded to an email from Winslow and stated, in part, "We have no reason to believe that anyone is violating Federal law." (1/25/2010 Email (ECF No. 32-1 at Page ID # 959).)

**Aroostook County Terminates Winslow**

Winslow was terminated from her position as LWIB's Executive Director by Beaulieu via a letter dated February 4, 2010.  In relevant part, Beaulieu's letter noted that on January 15,

2010, the CLEOs had signed an agreement designating the NMDC as the new grant subrecipient for the local WIA program effective February 15, 2010.  The letter indicated that Winslow's termination was effective on February 12, 2010.  In relevant part, the letter explained:

> Because the County of Aroostook will no longer be involved with the administration of this program, at the February 3, 2010 County Commissioners' Meeting, the Aroostook Board of County Commissioners approved termination of your employment as Executive Director of Workforce Investment Act Program for Local Area 1 effective February 12, 2010.

(Feb. 4, 2010 Ltr. (ECF No. 30-6); see also Winslow Dep. at 184-85.)  A copy of this letter went to each CLEO as well as to each Aroostook County Commissioner.  No copy was sent to LWIB and there is no evidence that LWIB ever voted to terminate Winslow as Executive Director. Winslow believed that it was a violation of the WIA for the County of Aroostook to have terminated her employment because she believed that only LWIB could terminate the Executive Director of the LWIB.

### NMDC Becomes the WIA Grant Sub-Recipient

By agreement dated January 14, 2010, the CLEOs designated NMDC to serve as the local agent and grant sub-recipient for WIA funds.  This agreement states that NMDC will serve as the staff of the LWIB "and perform duties assigned by CLEOs and LWIB."  (Local Area I Grant Sub-Recipient Agreement (ECF No. 32-12).)  By letter dated January 15, 2010, the LWIB transmitted their agreement to the Maine Department of Labor seeking the state's assistance to "effectuate this change in a timely manner." (1/15/2010 Letter (ECF No. 32-13).)  The letter, which was signed by both CLEOs, indicated that NMDC was "uniquely qualified" to serve as fiscal agent because of its expertise in grant administration and economic development.

Stephen Duval, Division Director of the Maine Department of Labor (and a member of the monitoring team), responded to the January 15th letter seeking clarification of the CLEO's

proposed assignment of LWIB staffing to NMDC.  (See 1/20/2010 Email (ECF No. 41-17) at Page ID# 1188.)  Beaulieu forwarded the Duval email to Robert Clark indicating that Clark should "hold off on advertising" for a new Executive Director until this issue was resolved and speculating that he may have "underestimated someone's influence in Augusta,"  which appeared to be a suggestion that Winslow may have been in contact with state officials. (Id.).

In January 2010, NMDC did advertise for the position of Director of Workforce Development.  As indicated in that posting, the Director would be responsible for providing professional management and administrative services, including, among other things, directing fiscal planning, budgeting, contract development, and assessment of the WIA programs in Aroostook and Washington Counties. The Director of Workforce Development would also serve as the Executive Director of the LWIB.  NMDC required that the applicant possess a Master's Degree in public administration or related field, or a combination of a Bachelor's Degree and related experience in economic development, workforce development, and public administration. The positing indicated that the deadline for applying was February 10, 2010.  (NMDC Position Posting (ECF No. 32-14).)

NMDC received several resumes and decided to interview four applicants:  Ryan Pelletier, Arthur Faucher, Patricia Boucher, who had served as LWIB's Executive Director from August 2003 until January 2008, and Dena Winslow, who had served as LWIB's Executive Director from April 2008 until February 2010.  Interview notes produced by NMDC (ECF No. 41-22) indicate "have to" next to Winslow's name and Faucher's name.  The same notes contain the notation "interview but no" next to Boucher's name.  Robert Clark and Ruby Bradbury interviewed the four candidates on February 17, 2010.  Prior to and during the interview process,

each of the applicants was provided with a copy of the job description for the position of Director of Workforce Development (ECF No. 32-18).

**Winslow's NMDC Interview**

On the day she interviewed for the position with NMDC, Winslow was unable to work because she was still recovering from her February 4, 2010 hip surgery. She indicated that she would be able to work when she received a medical release, which she expected to be "very soon." (Winslow Dep. at 277.)  During the interview, in response to questions about returning to work, Winslow reported that she had previously returned to work following a spinal fusion surgery after only three weeks of convalescence.  Winslow also reported that she had only missed one week of work in connection with each of her rotator cuff surgeries.  She did also indicate that she had been able to work from home following those prior surgeries and anticipated that the doctor would clear her for such telework sooner than she might be cleared for full-time work.

Winslow was also asked during the interview if there was anything in the job description she was unable to do.  Winslow responded that having just had hip surgery she could not lift 75 pounds, which the job description listed as an "occasional" requirement.  Bradbury indicated that this would not be a problem and that NMDC could make accommodations.[4]  At the end of the interview, Winslow grabbed on to chairs to assist her with walking.  She mentioned to Clark that she was "a bit gimpy" as a result of having recently had her hip surgery.  (Winslow Dep. at 278.)  At that time, Winslow admits that walking was the major life activity that was impacted by her

---

[4] Bradbury and Clark both now admit that the "occasional lifting up to 75 pounds" should not have been included in the job description and that lifting was not an essential function of the director position.  (See Bradbury Aff. (ECF No. 32-7) ¶6; Clark Aff. (ECF No. 32-9) ¶34.)  The parties dispute whether this same admission was made during Winslow's interview.

hip surgery.  Up until she went to the interview, she had been using a walker following her hip surgery.

Winslow did not receive a medical release until June 15, 2010.  (See Winslow Dep. at 276.)  After that date, she had no medical restrictions.  Ultimately, NMDC never employed Winslow.

**NMDC Hires Pelletier**

Following the interviews, Bradbury contacted references and conducted criminal records checks on Pelletier and Faucher.  At the time she did these background checks, she had not received signed authorizations from Winslow and Boucher.   Winslow did submit an authorization on February 22, 2010.

At the conclusion of the interview process, on or about February 19, 2010, NMDC offered the position of Director of Workforce Development and Executive Director of LWIB to Ryan Pelletier, who was also a NMDC Board Member.  The stated reasons for NMDC's conclusion that Pelletier was the best candidate include: (i) Pelletier had a Master's Degree in Public Administration; (ii) he had eleven (11) years of management experience in local government; (iii) he held positions of significant responsibility on several regional and state boards and committees, including, the Executive Committee of Maine Municipal Association, the Steering Committee of Aroostook Partnership for Progress, the Northern Maine Finance Corporation, the Northern Maine Development Commission, and the Board of Directors of the Aroostook County Action Program; (iv) he had contacts with the business community in Aroostook and Washington Counties and with the Maine Municipal Association; (v) he was able to clearly articulate the mission of the WIA programs; and (vi) he understood the importance of linking workforce development with economic development.  By all accounts, Pelletier is not

disabled and had never complained about illegal conduct.  Pelletier began work in the position on March 8, 2010.

By letter dated February 22, 2010, Winslow was notified that she had not been selected by NMDC for the director position.

On April 15, 2010, the CLEOs signed a Memorandum of Agreement ("MOA") with NMDC and the LWIB, memorializing the roles and responsibilities of the parties.

On May 26, 2010, Winslow filed her Maine Human Rights Act Complaint against Aroostook County and NMDC in which she alleged discrimination based on disability and whistleblower retaliation.

## III.   DISCUSSION

Plaintiff's Complaint states two claims against Defendant NMDC.  In Count III, she alleges that NMDC refused to employ her as LWIB's Executive Director because of her disability in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* and Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4571 *et seq.*[5]  In Count IV, she alleges that Defendant NMDC refused her employment in violation of the Maine Whistleblower Protection Act (MWPA), 26 M.R.S.A. §§ 831 *et seq.*.  NMDC seeks summary judgment on both claims.

Before turning to the substance of Plaintiff's two claims against NMDC, the Court clarifies that it does not construe the claims in this case as claims against a "joint employer." While NMDC devotes significant briefing to this issue, Plaintiff, in response, indicates that the

---

[5] The Court's analysis of the federal ADA claim applies with equal force to the state claim.  See, e.g., Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 n. 1 (1st Cir. 2007) ("Maine courts apply the MHRA in accordance with federal anti-discrimination law.").

Court "need not address NMDC's argument that it was not Plaintiff's 'joint employer.'" (Pl. Response (ECF No. 42) at 11.)   Rather, Plaintiff indicates that "failure to hire is equally actionable." (Id.)   The Court agrees with Plaintiff.   However, The Court also notes that the summary judgment record does not offer any factual support for "joint employer" theory for reasons adequately stated in Defendant's Motion.[6]   (See Def. Mot. (ECF No. 31) 10-12.) Therefore, the Court construes Plaintiff's discrimination claims against NMDC as seeking recovery for NMDC's failure to hire her in February 2010.

### A.  Count III:  Disability Discrimination

Traditionally, courts assessing summary judgment on disability discrimination claims involving indirect evidence first consider whether plaintiff presents the three-factor prima facie case required under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   Thus, "the plaintiff must show that he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of his disability." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 87 (1st Cir. 2012) (citing Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 74 (1st Cir. 2010); García–Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000)).   If the prima facie case is established on the summary judgment record, a presumption of discrimination arises.   Then, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.  . . . If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's

---

[6] Given Plaintiff's apparent forfeiture of the "joint employer" theory on summary judgment and the Court's finding regarding the lack of factual support for a conclusion that the two Defendants acted as "joint employers," the Court declines to address Defendant's alternative argument regarding failure to exhaust administrative remedies with respect to the joint employer theory.  (See Def. Mot. a 9-10; Pl. Response at 10-11.)

justification is mere pretext cloaking discriminatory animus." <u>Ramos-Echevarria v. Pichis, Inc.,</u> 659 F.3d 182, 186-87 (1st Cir. 2011) (internal citations omitted).

"In order to be a 'qualified individual' under the [ADA], the burden is on the employee to show: first, that she 'possess[es] 'the requisite skill, experience, education and other job-related requirements' for the position, and second, [that she is] able to perform the essential functions of the position with or without reasonable accommodation.'" <u>Garcia-Ayala</u>, 212 F.3d at 646 (internal citations omitted). On the facts presented, Winslow cannot pass over this initial hurdle with respect to her claim against NMDC. Given her prior employment as Executive Director, there is no basis to doubt that she possessed the basic requirements and experience for the position posted by NMDC. Nonetheless, Winslow was not a qualified person with a disability when NMDC made its decision not to hire her. At her interview, Winslow admitted that she had not yet received clearance to return to work. While she hoped to receive clearance soon, it turned out that she was not cleared to return to work until June 15, 2010. While Plaintiff argues that NMDC should be deemed to have made a decision to not hire her prior to February 2010, this argument is factually implausible. The undisputed record is that NMDC interviewed Winslow and others for the director position on February 17, 2010. It offered the position to Pelletier on February 19, 2010 and informed Winslow that she would not be hired on February 22, 2010. Thus, the date of the adverse employment decision is no earlier than February 17, 2010. <u>Richardson</u>, 594 F.3d at 80 n.8 ("In most cases, the relevant date for determining whether an individual is qualified for her position is the date of the adverse employment decision.")

On that date, Winslow was unable to attend work on a regular basis and it was unknown when that medical restriction would be lifted. Given the challenges facing the LWIB and NMDC, as its new fiscal agent, attendance was an essential function. <u>See Mulloy v. Acushnet</u>

Co., 460 F.3d 141, 147-148 (1st Cir. 2006) (The "inquiry into essential functions 'is not intended to second guess the employer or to require the employer to lower company standards.'") (*quoting* Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004)).   Because Winslow was unable to say when she would be able to return to work and, in fact, was unable to return to work until June 2010, the Court finds she was not a qualified person with a disability.[7]

While the parties brief a plethora of alternative arguments with respect to Count III, the Court need not and does not address those alternative arguments given its finding that Plaintiff cannot establish a trialworthy issue that she was disabled yet qualified to do the position at the time NMDC made its hiring decision.

### B.  Count IV: Whistleblower Discrimination

The Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S.A. § 831 *et seq.*, states in relevant part:

> No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith, or a person acting . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of . . . the United States.

26 M.R.S.A. § 833(1)(A).  As it relates to Winslow's claim against NMDC, "the protection afforded by the MWPA is 'unambiguously limit[ed] . . . to (1) employees (2) who report to an employer [or public body] (3) about a violation (4) committed or practiced by that employer.'" Bodman v. Maine, Dept. of Health & Human Services, 787 F. Supp. 2d 89, 109 (D. Me. 2011) (*quoting* Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1054 (Me. 2008)); see also Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 217 (D. Me. 2002) (explaining that "*absent*

---

[7] Notably, there is nothing in the record to indicate that upon receiving clearance to return to work, Winslow had any disability.  Thus, Winslow was unable to perform the essential functions of the position from the date of her interview until June 15, 2010.  As of that date, the record does not support a finding that Winslow had any disability.

from the MWPA is protection for an employee who is fired merely because he refuses to obey a directive he reasonably believes to be illegal").

An employee claiming discrimination in violation of the MWPA may pursue a claim for unlawful discrimination under the MHRA. See 5 M.R.S.A. § 4572(1)(A). "To prevail on an MHRA claim for whistleblower discrimination, [Plaintiff] must show that she engaged in activity protected by the WPA, she experienced an adverse employment action, and a causal connection exists between the protected activity and the adverse action." Fuhrmann v. Staples Office Superstore E., Inc., 2012 ME 135, --- A.3d --- (Me. 2012) (citing Currie v. Indus. Sec., Inc., 915 A.2d 400 (Me. 2007)). Once these three elements are established, Defendant must present "a legitimate, non-retaliatory motive for the adverse employment action." See Bodman, 787 F. Supp. 2d at 109 (citing DiCentes v. Michaud, 719 A.2d 509, 514 (Me. 1998); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)). "The final burden to prove the existence of the causal nexus remains with the plaintiff." LePage v. Bath Iron Works, 909 A.2d 629, 636 (Me. 2006) (citing DiCentes, 719 A.2d at 515). Under this burden shifting paradigm, "establishing a factual dispute as to whether a causal connection exists between the report protected by the [M]WPA and the adverse employment action" will allow a plaintiff to survive summary judgment if she reaches the final step. See Halkett v. Corr. Med. Servs., Inc., 763 F. Supp. 2d 205, 220-21 (D. Me. 2011) (quoting Stanley v. Hancock Cty. Comm'rs, 864 A.2d 169, 177 (Me. 2004)).[8]

Plaintiff attempts to assert that her reports to Beaulieu and Aroostook County qualify as her reports of violations committed by her employer. The Court first notes that under this theory

---

[8] In the absence of controlling case law specific to the MWPA, the Court may also look to similar federal whistleblower laws for guidance. See Maine Human Rights Comm'n v. Maine Dept. of Defense & Veterans' Services, 627 A.2d 1005, 1007 (Me. 1993) ("The Maine Whistleblowers' Protection Act is also comparable to its federal counterpart, 5 U.S.C.A. § 2302(b)(8).")

the initial in-person report directly from the federal monitor to the County Administrator would not qualify as a report made by Winslow.  To the extent Winslow argues that her later iterations of the findings of the federal monitors to LWIB and/or Beaulieu qualify as reports made to her employer, the Court does not agree with these characterizations.   First and foremost, these reports most accurately are described as Winslow simply fulfilling her duties as Executive Director.  See, e.g., Capalbo v. Kris-Way Truck Leasing, Inc., 821 F. Supp. 2d 397, 419 (D. Me. 2011) (granting summary judgment when employee's MWPA claim was based on required reports he made at the direction of his employer).  Winslow's exit interview notes, which are her first written report of the findings of the monitoring visit, were drafted and distributed pursuant to the express directions of the County Administrator.  Winslow also included information regarding the monitoring visit findings in her December 31, 2009 "Opportunity" email to the LWIB.  However, this email amounted to Winslow acting in accordance with the directive she had received from Theberge to report directly to the LWIB.  As a result, the Court cannot find any report by Winslow that was a genuine attempt to "blow the whistle" on a violation of the WIA program rules.  Rather, the record reflects a genuine effort by Winslow during her tenure as Executive Director to ensure she followed the rules as she understood them.

Additionally, the facts do not present a situation in which violations would have been hidden from public view or correction in the absence of Winslow's reports.  To the contrary, Winslow was simply reiterating information that quickly became widely known and publicly available following the monitoring visit.  Thus, the record reflects that this public dissemination would have occurred without any "whistleblowing" by Winslow.  Under these circumstances, this case is not analogous to Parks v. City of Brewer, 56 F. Supp. 2d 89 (D. Me. 1999).  In Parks, the city employer was denied summary judgment on a whistleblower claim although they argued

that Plaintiff was not the first person to report the violation.  See id. at 102-03.  In denying summary judgment, the Court explained that the prior report was by the employee essentially seeking approval of the violation.  Thus, the prior report "cannot fairly be characterized as whistleblowing" and Parks appeared to be the first person to report that the approval sought was in fact a violation of law.  Id. at 103.  In this case, there is no evidence suggesting that Winslow's reports were of a substantively different nature than the prior reports of the results of the federal monitoring visit.  While the MWPA might be read to extend protection to multiple employees who report the same violation, the Court does not believe it protects the repeating of publicly available information.  See, e.g., Meuwissen v. Dep't of Interior, 234 F.3d 9, 13 (Fed. Cir. 2000) ("A disclosure of information that is publicly known is not a disclosure under the WPA. The purpose of the WPA is to protect employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information.");  Helbig v. City of Bowling Green, 371 S.W.3d 740, 743 (Ky. Ct. App. 2011), review denied (Aug. 15, 2012) (dismissing claim under Kentucky's Whistleblower Protection Act that was based on an employee's disclosure of "publicly available information"). Cf. Currie, 915 A.2d at 407 & n.7 (concluding that an employee's internal report of dumping qualified as a "report" under the MWPA when "management first learned of the dumping through his report" even though DEP had received earlier reports of the same dumping).

In this case, the substantive information Winslow claims to have disclosed was first publicly announced on December 2, 2009 at an Aroostook County Commissioner's Meeting. Following that meeting, it is clear that Aroostook County, in its role as the employer, was engaged in reasonable efforts to correct that violation.  See 26 M.R.S.A. § 833(2) (noting that whistleblower protection for reports to public bodies applies only when "the employee has first

24

brought the alleged violation . . . to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation"). Under these unique circumstances, the Court concludes that Winslow cannot as a matter of law succeed on her Count IV claim under the MWPA.  Rather, the Court finds that Winslow's multiple reports of the results of the federal monitoring were done in the ordinary course of fulfilling her duties.  Moreover, Winslow's reports after the beginning of December amount to reports of publicly available information, which Aroostook County was reasonably attempting to correct.

Given the Court's conclusion that Plaintiff's reports do not qualify as whistleblowing, the Court need not address Defendant's additional arguments for seeking summary judgment on Count IV.  Thus, the Court declines NMDC's invitation to find on the record presented that Winslow did not act in good faith.   (See Def. Mot. for S.J. at 20.)  Likewise, despite Defendant's arguments, the Court believes that construing the record in the light most favorable to Plaintiff, it would appear that Winslow had reasonable cause to believe that there were violations of the WIA.  (See id. at 23.)  Given Plaintiff's arguments regarding pretext, inferences to be made from temporal proximity, and the disputed reactions of Clark to Winslow's statements between December 2009 and January 2010, the "causal connection" prong is not amenable to resolution on summary judgment despite Defendant's arguments to the contrary.  (See id. at 26-27.)

Nonetheless, having concluded that Winslow's alleged reports do not qualify for whistleblower protection under the MWPA, the Court concludes Defendant is entitled to summary judgment on Count IV.

### C.  Punitive Damages

In light of Plaintiff's withdrawal of her request for punitive damages, the Court GRANTS WITHOUT OBJECTION Defendant's Motion to the extent it sought summary judgment on Plaintiff's Claims for punitive damages.  (See Pl. Response at 23.)

## IV.    CONCLUSION

For reasons just explained, the Court hereby GRANTS Defendant Northern Maine Development Commission's Motion for Summary Judgment (ECF No. 31) and ORDERS that judgment enter in favor of Defendant NMDC on Counts III & IV of Plaintiff's Complaint.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 15th day of February, 2013.